UNITED STATES DISTRICT COURT:
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------------------X
DYLAN MILES
                                    Plaintiff,                                    Case No.:1:23-cv-7538

-against-

THE CITY OF NEW YORK, DEPARTMENT OF CORRECTIONS
AMKC (RIKERS ISLAND), NEW YORK CITY HEALTH +
HOSPITALS CORPORATION (CORRECTIONAL HEALTH
 SERVICES), PREA AGENT 934,   PREA AGENT 188,
PREA AGENT 916, "DOE 1-18",
                                    Defendants.
----------------------------------------------------------------------------------X

## INTRODUCTION

1.      Plaintiff, Dylan Miles, is a transgender woman who, on or about June 14, 2022,

was incarcerated at the George R. Vierno Center, located at 09-09 Hazen Street, in the County of

Bronx, City and State of New York, also known as Rikers Island, which is owned and operated

by the CITY OF NEW YORK & DEPARTMENT OF CORRECTIONS AMKC (RIKERS

ISLAND).

2.      Ali "Dylan" Miles (hereinafter "Miles") is a LGBTQIA+ individual, who was

born with male genitalia and identifies as woman. MILES is in the process of transitioning into a

woman and at all relevant times hereto was undergoing hormone treatments (estradiol), and other

transitions including coming out to her friends and family, asking people to use pronouns that

match her gender identity, dressing and grooming in ways that match her identity, and laser hair

removal.

3.      Miles wears women's clothing and in all appearance expresses as a person of

the female gender.

4.      Defendants' unlawful conduct was repeated and severe. Among other things,

Defendants placed her in a men's housing unit despite her objections, court orders, and her

requests to be housed with women; isolated her in segregation; delayed and denied her access to healthcare; routinely harassed and misgendered her; ignored her repeated pleas for help and for protection from the threats and sexual victimization to which they had exposed her.

5.      The Defendants were grossly negligent in supervising subordinates who committed  the wrongful acts, and exhibited deliberate indifference to the rights of Miles' by failing to act on information indicating unconstitutional acts were occurring to protect Miles who was raped/sodomized on two (2) separate occasions by the same male inmate, was assaulted and battered by the same male assailant causing fractured ribs, and suffered permanent blindness as the result of being doused in the face with chemicals. All of this caused her painful and long-lasting harm.

6.      Defendants' unlawful conduct was a direct result of RIKERS' pervasive, practices, and customs of discrimination, deliberate indifference, against transgender people.

7.      Until Defendants change their policies, practices, and customs, MILES and other transgender people will experience similar depraved mistreatment in the future.

8.      MILES was deprived her right to Petition the Government and was retaliated against for attempting to assert her First Amendment rights under the U.S. Constitution.

9.      Through this action, MILES seeks damages, and attorneys' fees.

### JURISDICTION AND VENUE

10.      The Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

11.      This Court also has supplemental jurisdiction over claims asserted against Defendants under New York State law pursuant to 28 U.S.C. § 1367.

12.      MILES' Notice of Claim against New York County (the "County") was filed with the New York County Clerk's Office and the New York County Attorney on September

2

12, 2022.

13.     The County requested that MILES participate in a N.Y. Gen. Mun. Law 50-h

hearing, and same was conducted and completed on May 24, 2023.

14.     Venue lies in the District of New York under 28 U.S.C. § 1391(b)(2) because the

relevant events occurred in New York County.

## PARTIES

15.     Plaintiff Dylan Miles is a natural person and a transgender woman. She

was in Defendants' custody at RIKERS from approximately June 14, 2022 through

July 2022.

16.     Plaintiff Dylan Miles currently resides in the State of Arizona.

17.     Defendant City of New York, is a city organized under the laws of the State of New

York, and a public entity covered by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C §

794 ("Section 504"), with a principal place of business at 1 Centre Street, New York, NY 10007.

18.     Defendant , DEPARTMENT OF CORRECTIONS AMKC (RIKERS ISLAND),

s an agency of the City of New York with a principal place of business at 1 Centre Street, New

York, NY 10007.

19.     Defendant NEW YORK CITY HEALTH +HOSPITALS CORPORATION

(CORRECTIONAL HEALTH SERVICES) is a city organized under the laws of the State of New

York, and a public entity covered by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C §

794 ("Section 504"), with a principal place of business at 50 Water Street, 17th Fl, New York, NY

10004.

20.     Defendant PREA AGENT 934, is a correctional officer employed at RIKERS and

was the RIKERS PREA Offices  (Prison Rape Reduction Act) at all times relevant to this

Complaint.

21. On information and belief, Defendant PREA AGENT 934, is a resident of the Southern District of New York.

22. The identity of PREA AGENT 934 is currently unknown, and this individual is being sued in their individual and official capacities.

23. Defendant , PREA AGENT 188, is a correctional officer employed at RIKERS and was the RIKERS PREA Offices  (Prison Rape Reduction Act) at all times relevant to this Complaint.

24. On information and belief, Defendant , PREA AGENT 188, is a resident of the Southern District of New York.

25. The identity PREA AGENT 188, is currently unknown, and this individual is being sued in their individual and official capacities.

26. Defendant PREA AGENT 916, is a correctional officer employed at RIKERS and was the RIKERS PREA Offices  (Prison Rape Reduction Act) at all times relevant to this Complaint.

27. On information and belief, Defendant PREA AGENT 916, is a resident of the Southern District of New York.

28. The identity of PREA AGENT 916, is currently unknown, and this individual is being sued in their individual and official capacities.

29. Defendant Does 1–6 were each employed at RIKERS as correctional staff at all times relevant to this Complaint, and were personally involved in the violations of MILES' rights. On information and belief, Defendant Does 1–6 are each residents of the Southern District of New York.

30. Defendant Does 6–10  were each employed as Intake Officers and are RIKERS

correctional officers who participated in or were present for and did not intervene in the assault(s) and strip search of MILES when RIKERS took her into custody in (the "Intake Officers")  in or about June 14, 2022.

31.     On information and belief, Defendant Does 6-10 are each residents of the Southern District of New York.

32.      Does 11-15 are individuals, who upon information and belief, are supervisors or higher-ranking officers and a supervisor(s) or higher-ranking officer(s) of the Defendant with decision making authority, and who participated in, or who knew of  the harms alleged herein.

33.     On information and belief, Defendant Does 11-15 are each residents of the Southern District of New York.

34.     Defendants Does 16-18 are medical doctors/physicians and staff employed at RIKERS and/or New York City Health + Hospitals Corporation (Correctional Health Services) and/or Defendant, who at all times relevant to this Complaint refused MILES' requests for medically necessary medication and treatment.

35.     The City and the Department of Corrections both receive federal funding.

36.     Under Federal Law the Defendants must implement the Federal Prison Rape Reduction Act, or risk losing substantial federal funding.

37.     On information and belief, Defendant Does 16-18 are each residents of the Southern District of New York.

**FACTUAL ALLEGATIONS**

38.     At all relevant times hereto, the Defendants knew and have known that LGBTQIA+ individuals who are transgendered at a heightened risk of violently assaulted both sexually and physically while in custody.[1]

39.     At all relevant times hereto, the Defendants have promulgated rules, regulations, and practices to ensure that  LGBTQIA+ individuals who are transgendered are housed and given accommodations to ensure that these individuals are not violently assaulted both sexually and physically while in custody.

40.     At all relevant times the Defendants knew and have known that Miles was to benefit from, and be treated in accordance with, the Defendants' promulgated rules, regulations, practices, and was to receive  accommodations given to LGBTQIA+ individuals who are transgendered to ensure that Miles was not violently assaulted both sexually and physically while in custody.

41.     At all relevant times hereto Defendants, and  Does 1-15 were aware of The City of New York Department of Correction Directive, Elimination of Sexual Abuse and Sexual Harassment, Classification 5011R-A.

42.     Defendants, and  Does 1-15 were aware that transgender individuals, like Miles, were at a heightened risk of being sexually assaulted, and physically battered and assaulted by male inmates.[2]

---

[1] According to the U.S. Department of Justice, National Crime Victimization Survey, 0.11% of persons age 16 or older identified as transgender during 2017–20.4. During this period, the rate of violent victimization was 2.5 times as high for persons who identified as transgender (51.5 victimizations per 1,000 persons age 16 or older) as persons who identified as cisgender[1] (20.5 per 1,000).

[2] 80% of respondents surveyed in a report by the Silvia Rivera Law Project, Statewide Report on the Trans, Gender Non-Conforming, Intersex Experience in New York Prisons, experienced at

43.     Defendants, and Does 1-15 were aware that Corrections Officers and DOCCS staff  use of derogatory names and slurs against transgender individuals, and do not use correct names or pronouns.[3]

44.     At all relevant times hereto the Defendants promulgated Directives and Regulations to protect Miles from harassment, sex assault, physical abuse, and retaliation.

45.     Directive 1 4498R-A "Lesbian, Gay, Bisexual, Transgender, Intersex, Gender Non-Binary and Non-Conforming Inmates" requires.

a.      It is the policy of the Department of Corrections to house and/or provide secure, safe and humane custody of all persons, including... gay, transgender, gender non conforming and gender nonbinary individuals who are lawfully committed or held in confinement.

b. All staff are to address transgender inmates using the inmates last name or preferred names and pronouns as indicated on a "special consideration housing form".

c. All staff is required to complete pre developed LGBT I-GNC-G N B training including special considerations unit staff, intake staff, general office staff.

d. All inmates are to be screened  Prison Rape Enforcement Act screening at intake.

e. When deciding housing placement for a transgender inmate the department shall consider placement that ensures the inmates health safety and or security concerns and said persons shall be housed in the facility consistent with their gender identity.

---

least one physical assault by another incarcerated person. https://takerootjustice.org/wp-content/uploads/2021/06/Its-Still-War-In-Here-1.pdf.

[3] Pdf p. 24 of 64  https://takerootjustice.org/wp-content/uploads/2021/06/Its-Still-War-In-Here-1.pdf.

f. Consideration for housing shall include the risk vulnerability and safe placement of each transgender and nonbinary individual. As well as the inmates own views of where they feel the safest as documented on forms provided to and filled out by the inmate.

g. Consideration is also given to the inmates prior institutional history including incidents and grievances, whether the inmate is at risk because the inmate is, or is perceived to be, gay, bisexual, transgender or gender nonconforming, Whether the inmate has previously experienced sexual victimization, the existence of separation orders or requests between inmates and or staff.

h. Pursuant to procedures "2" inmates who are known by the department to identify as transgender shall be given a "Special Considerations Housing Form" to fill out during intake, booking, or at any time while in the department custody. This procedure is an ongoing obligation.

i. Special Considerations Determination Unit ("SCDU") is to make a determination as to the appropriate housing measures to be taken with respect to the inmate.

j. Procedures dictate that all searches of inmates, absent exigent circumstances, are to be performed by officers of the gender requested and documented in writing on the special consideration housing form or if not possible, by an officer of the same perceived gender identity as the inmate.

k. No search shall be conducted for the sole purpose of observing A transgender or intersex inmates genital characteristics.

l. Defendants staff are prohibited from using transphobic, homophobic or derogatory language towards an individual's gender, and should respect an individual's gender identity, pronoun and preferred name.

46.     At all relevant times hereto the Does 1-15 knew of the  promulgated Regulations to protect Miles from harassment, sex assault, physical abuse, and retaliation.

47.     At all relevant times hereto the Does 1-15 knew of the  promulgated Regulation/ Procedure promulgated September 19, 2019,  entitled Transgender Notification for Securing Order/ Sentence and Commitment, which provides that a Judge notation of ie. "transgender identifies as female, on the Securing Order/ Sentence and Commitment, and/or the Criminal Court Commit Sheet, a notification will be made to the majors office and will be forwarded to citywide operations, in addition to UOR being submitted.

48.      At all relevant times hereto the Does 1-15 knowingly disregarded judicial markings of "transgender" or "transgender identifies as female" on Miles' Securing Order/ Sentence and Commitment, and/or Miles' Criminal Court Commit Sheet.

49.     At all relevant times during the COVID Pandemic, Elizabeth Musky, Director of LGBTQ+ Affairs NYC Department of Correction, issued the October 6, 2021 Memorandum, regarding Securing orders and Housing of TGNCNBI People in Custody.

50.     The Memorandum stated that the department has made it a priority to ensure the safety of transgender women in custody, particularly by housing individuals in alignment with their gender identity whenever possible. The Memorandum provided clarity on DOC's housing policies, to ensure that transgender women were being housed in female facilities, to "lower the risk of physical and sexual assault" that these individuals would ordinarily face when being housed in male facilities.

51.     At the time of the Memorandum, all individuals were subject to a 10 day mandatory quarantine at a male or female intake facility which was determined by a box checked male or female on the securing order.

52.     According to the Memorandum, defense counsel, judges, and Office of Court Administrative staff were asked to ensure that the "female" box on the securing order be checked for any person that identifies as a transgender woman.

53.     The Memorandum stated: "it is important that we work together to prevent transgender women from being placed in a male intake facility for the 10 day intake., where they face a tremendously high risk of physical and sexual assault."

54.     At all relevant times hereto the Does 1-15 knowingly disregarded the October 6, 2021 Memorandum, regarding Securing orders and Housing of TGNCNBI People in Custody.

<u>June – July 2022 Detention</u>

55.     Miles was arrested in or about June 14, 2022, on assault allegations, which were subsequently dismissed by the People who declined to prosecute the case.

56.     When Miles was arrested in or about June 14, 2022, there was a warrant hold in effect that was issued out of Yavapai County, Arizona.

57.     Miles' court appointed attorney that works for the Legal Aid Society, told the Judge at the central booking, upon Miles' arraignment, in the Bronx criminal court that Miles is a gender non-conforming/ Transgender female, who required special accommodations to ensure her safety while being incarcerated.

58.     The judge said "I will mark that down."

59.     Upon information and belief, The Court File and documents/orders contained therein were marked to notify Defendants and their Intake Personnel that Miles was to be housed in a female facility and/or that other accommodations were to be made to protect Mile's physical integrity and safety.

60.     At all relevant times hereto, Defendants knew that Miles was receiving Estradiol while in their custody, which she is taking as part of her gender transitioning.

61.     After arraignment Does 1–15 placed Miles is handcuffs connected to a male inmate and escorted Miles to Rikers Island.

62.     As Miles approached the inside of the building Miles realized it was a male jail which caused shock, panic and fright to Miles.

63.     Miles got Does 1–15  attention and explained her situation.

64.     Miles requested and pleaded with the Does 1–15,  that as an LGBTQIA+ individual who was transgendered, she required and needed an accommodation, and that she should not be placed in a male population jail.

65.     The Corrections Officer that the Does 1–15,  alerted his commander (white shirt) and the commander (Does 11–15) said "We don't do the trans thing here."

66.     As Miles was going through security Miles was told by Does 1-15 to strip naked and the male security guard (Doe 1-15) said, "nice tits and that's one hell of a pussy."

67.     Miles suffered shock, fright, humiliation as the result of being strip searched by male Correction Officers(Doe 1-15), in front of other male inmates, rather than being strip searched by a woman Correction Officer, in a women's or specially designated LGBTQ facility.

68.     The LGBTQ slurs of the Correction Officer (Doe 1-15) caused Miles to suffer shock, fright, and humiliation.

69.     Miles was then placed into a cell by herself.

70.     An hour later an African American male was put into the same cell with Miles.

71.     Miles' male cell-mate explained that he was crack addicted and had a mental disorder that he took ambilify for.

72.     He then threatened Miles with rape if Miles didn't hand him her shoes.

73.     Upon information and belief, Miles sought the assistance of Corrections Officers, who refused to intervene.

74.      Under the threat of physical and emotional trauma, Miles gave the other inmate her shoes.

75.     Miles cell-mate continued to threaten to rape Miles.

76.      Miles' cell-mate directed that if Miles didn't cover the camera with Miles' shirt he'd kill her.

77.     Under threat of imminent physical harm,  Miles' covered  camera in the cell under the threat of physical harm.

78.     Then Miles' cellmate proceeded to cover another security camera and proceeded to rape Miles.

79.     Doe 1-15 knew that the security cameras in the cell had been covered.

80.     Doe 1-15 knew that covering security cameras in the cell was against protocol and regulations.

81.     Upon information and belief,  protocol requires Doe 1-15 to immediately report to Miles' cell to uncover the security cameras, and to investigate the conduct and condition of Miles' and her cellmate.

82.      Doe 1-15 disregarded protocols, procedures and failed to report to Miles' cell.

83.     During that time Miles was brutally and maliciously sexually assaulted and raped.

84.     Miles' did not consent or give permission to engage in any physical contact with her attacker.

85.     Miles reported the incident to Corrections Officers (Doe 1-15), who did not report the incident pursuant to Prison Rape Elimination Act ("PREA") protocols and procedures.

86.     After further and additional requests of Miles to Corrections Staff (Doe 1-15), she was transferred to protective custody in a different cell.

87.     Had (Doe 1-15) and the Defendants placed Miles' in protective custody from upon arrival at Riker's Mile's would not have been raped.

88.      As soon as Miles was placed in protective custody (Cell 23) a  49 year old African American male in a neighboring cell ("Offender 2") approached Miles and said "I know your gay and I'm going to rape you!"

89.     Five days later, on or about June 19, 2022, the same inmate approached the door of Miles' cell and began masturbating in front of Miles.

90.     He left after 3 minutes at which time Miles sought the assistance of Corrections Officers, who refused to intervene.

91.     Upon information and belief Does 1-15 knew that Offender 2 had performed lewd sex acts in front of Miles.

92.     Upon information and belief Does 1-15 knew Defendants have a zero-tolerance policy prohibiting the performance of lewd sex acts.

93.     The Defendants Does 1-15, took no action against the Offender 2, and took no corrective action to further protect Miles from sex abuse and assault.

94.      Five minutes later, the same inmate returned to Miles cell, and forcibly entered Miles' cell by pushing through cell door, overpowering Miles.

95.     Doe 1-15 knew that the Offender 2 was involved in a physical altercation at the door of Miles' cell.

96.     Doe 1-15 knew that Offender 2 was forcibly attempting to enter Miles' cell by pushing open the door of Miles' cell.

97.     Doe 1-15 knew that Offender 2's attempt to forcibly enter Miles' cell by pushing through Miles' cell door was against protocol and regulations.

98.     Upon information and belief,  protocol requires Doe 1-15 to immediately intervene to stop Offender 2 from being successful in his attempt to forcibly enter Miles' cell.

99.      Doe 1-15 disregarded protocols, procedures and failed protect Miles by abating the threat that Offender 2 presented.

100.    Doe 1-15 disregarded protocols, procedures and failed intervene to stop Offender 2 from forcibly entering Miles' cell.

101.    Offender 2 overpowered Miles and was successful in pushing his way through the cell door and he entered Miles' cell.

102.    Offender 2 then proceeded to brutally and maliciously sexually assault and rape Miles.

103.    Offender 2 sodomized Miles' and used butter as a lubricant.

104.    All of these acts were done to Miles' without Miles' consent or permission.

105.    The Defendants and Does 1-15 knew that Miles was being sexually abused and took no action to abate the harm at the time of the attack.

106.    When the inmate stopped raping Miles, Miles collected the bed sheet with blood and semen on it and stored it.

107.    At or about this time a hearing was held (the specifics, of which are not currently known), at which time Miles produced the hearing officer/arbiter/judge, the bed sheet with blood and semen on it, as evidence that she had been raped.

108.    Miles informed the tribunal that she had been forcibly raped, she requested protection and that she be moved to a female population facility.

109.    The hearing officer/arbiter/judge made findings and issued directives to ensure the safety of Miles.

110.    Miles again alerted Correction Officers (Doe 1-15) which purported to respond pursuant to PREA.

111.    Three officers (PREA Agents 934, 188, 916) came to Miles, recorded her statement and took Miles' evidence to send to the lab.

112.    The Corrections Officers (PREA Agents 934, 188, 916) informed Miles that they were sending notice pursuant to and in accordance with PREA, and that notice he was  being circulated to ensure that Offender 2 would be separated from Miles and ensured that Miles would be safe from Offender 2 and others.

113.    Doe 1-15 knew that of the  PREA notice and knew that notice ensuring  Offender 2 would be separated from Miles were in effect.

114.    After being interviewed, Miles returned to her cell in protective custody, only to find that Offender 2 was present.

115.    PREA Agents 934, 188, 916, and Doe 1-15 knew that  Offender 2 was in the presence of Miles.

116.    Offender 2  then physically battered and assaulted Miles in her cell by throwing buckets of boiling water on her face and chest.

117.    Upon information and belief dangerous and toxic chemicals were added to the bucket of boiling water.

118.    Within a matter of minutes of Miles' returning to protective custody, Offender 2 then physically battered and assaulted Miles in her cell by striking Miles with his fists and arms.

119.    Within a matter of minutes of Miles' returning to protective custody, Offender 2 then physically battered and assaulted Miles in her cell by striking Miles repeatedly with a cane.

120.    PREA Agents 934, 188, 916, and Doe 1-15 knew that  Offender 2 was viciously assaulting and battering Miles.

121.    PREA Agents 934, 188, 916, and Doe 1-15 took no action to intervene to stop Offender 2 from viciously assaulting and battering Miles.

122.    As the result of the attack Miles was partially and permanently blinded in both eyes.

123.    As the result of the attack Miles was burned.

124.    As the result of the attack Miles sustained a broken rib and bruised ribs.

125.    Doe 1-15 took Miles to the doctor to receive medical attention.

126.    While in the medical facility Miles was given an estradiol shot by  Does 16-18

127.    While in the medical facility Does 16-18 refused to administer an anti-viral medicine for HIV precaution to Miles.

128.    Miles  requested that Does 16-18 treat her with an anti viral, she was informed that no incident of rape was reported in their system, so Does 16-18 were not permitted to administer an anti-viral.

129.    Miles reported to Does 16-18 that she was experiencing partial blindness as the result of chemicals being thrown in her eyes.

130.    Miles reported to Does 16-18 that she was experiencing pain in her eyes as the result of chemicals being thrown in her eyes.

131.    Miles requested that Does 16-18 treat her eyes to stop the pain.

132.    Miles requested that Does 16-18 treat her eyes to cure the blindness.

133.    Does 16-18 failed to take medically necessary steps required to reverse or otherwise heal Miles' blindness.

134.    After being released from medical treatment, Miles was returned to the prison population, and not in protective custody.

135.    Miles was placed in an open cage/cell by herself for 3 days while she was repeatedly peed on, spit on, and called a trans faggot by many of the inmates in the cage adjacent to hers.

136.    Miles  remained in the open cage/cell for three (3) days while the never ending attacks took place.

137.    Miles complained to Defendants, including, Does 1-15  that she was being abused in the open cage/cell.

138.    Does 1-15 knew that Miles was being abused in the open cage/cell but took no action or steps to protect Miles.

### AS AND FOR A FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 Eighth Amendment USC Failure to Protect
### Does 1-15,  Prea Agents 934, 188, 916; Failure to Supervise Doe 11-15

139.    Plaintiff repeats and reiterates the factual allegations at paragraphs "1" through "138" as if more fully set forth herein.

140.    Defendants and Does 1-15, and PREA AGENT 934,  PREA AGENT 188, and PREA AGENT 916, have a duty to take reasonable measures to guarantee Miles  safety at all times that she was in custody.

141.    Defendants and Does 1-15, and PREA AGENT 934,  PREA AGENT 188, and

PREA AGENT 916, have a duty to protect Miles from violence at the hands of other prisoners/inmates.

142.    Defendants and Does 1-15, and PREA AGENT 934,  PREA AGENT 188, and PREA AGENT 916, have a duty to protect Miles from sexual abuse at the hands of other prisoners/inmates.

143.    Defendants and Does 1-15, and PREA AGENT 934,  PREA AGENT 188, and PREA AGENT 916, acted with deliberate indifference towards keeping Miles safe.

144.    Defendants and Does 1-15, and PREA AGENT 934,  PREA AGENT 188, and PREA AGENT 916, knew that Miles' being gender non-conforming, transexual, faced a substantial risk of physical harm from other inmates.

145.    Defendants and Does 1-15, and PREA AGENT 934,  PREA AGENT 188, and PREA AGENT 916, knew that Miles' being gender non-conforming, transexual, faced a substantial risk of being sexually assaulted by other inmates.

146.    Defendants and Does 1-15, and PREA AGENT 934,  PREA AGENT 188, and PREA AGENT 916, knew that Miles was being incarcerated under conditions posing a substantial risk of serious harm to her, when she was placed in a male general population prison setting.

147.    Defendants and Does 1-15, and PREA AGENT 934,  PREA AGENT 188, and PREA AGENT 916, knew that Miles was being incarcerated under conditions posing a substantial risk that she would be sexually assaulted, when she was placed in a male general population prison setting.

148.    Defendants and Does 1-15, and PREA AGENT 934,  PREA AGENT 188, and PREA AGENT 916, knew that Miles was being incarcerated under conditions posing a

substantial risk of serious harm to her, and of being sexually abused, when she was placed in a cell with a male prison inmate.

149.    Defendants and Does 1-15, and PREA AGENT 934,  PREA AGENT 188, and PREA AGENT 916, knew that Miles was being incarcerated under conditions posing a substantial risk of serious harm to her, and of being sexually abused, when she was placed in a cell in the proximity of Offender 2.

150.    Defendants and Does 1-15, and PREA AGENT 934,  PREA AGENT 188, and PREA AGENT 916, disregarded the risk to Miles when they placed her and kept her in the male population prison.

151.    Defendants and Does 1-15, and PREA AGENT 934,  PREA AGENT 188, and PREA AGENT 916, disregarded the risk to Miles when they placed her and kept her in the male population prison, placed her in a cell with a male inmate, placed her in close proximity of Offender 2

152.     Doe 11-15 were grossly negligent in supervising subordinate Does 1-10 and PREA AGENTS 934, 188, 916, who committed the wrongful acts done to Miles, and were also deliberately indifferent  to the rights of Miles, when they failed to act on information indicating that Miles' Eighth Amendment Rights were being violated, when they failed to take reasonable measures to abate the harm when they knew or should have known that:

152.a  Miles' was being  housed with men, gratuitously revealed her transgender status to staff and men in custody,

152.b  Miles had failed to be placed in protective custody;

152.c. Miles was being misgendered by Does 1-10;

152 .d Does 1-10  failed to respond adequately to Miles' repeated requests for protection

against harassment, threats, and sexual victimization at the hands of Does 1-10 and other inmates;

152.e. Does 1-10 did not house Miles outside the vicinity of Offender 2;

152.f. Does 1-10 failed to prevent Offender 2 from being in the vicinity of Miles;

152.g. Does 1-10 failed to intervene when Offender 2 fought his way into Miles' cell, beat and blinded Miles;

152.h. Does 1-10 approved Miles being housed in the open cage;

152.i. Does 1-10 permitted Miles to be repeatedly peed on, spit on, and called a trans faggot by many of the inmates in the cage adjacent to hers, for three days.

153.    The conduct of Defendants and Does 1-15, and PREA AGENT 934,  PREA AGENT 188, and  PREA AGENT 916, posed an unreasonable risk of serious damage to Miles health, in the form of being twice sexually assaulted/raped, battered, burned, blinded, and urinated and spit upon for three days.

## AS AND FOR A SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 First Amendment & Retaliation
### Does 1-15, Prea Agents 934, 188, 916; Failure to Supervise Doe 11-15

154.    Plaintiff repeats and reiterates the factual allegations at paragraphs "1" through "153" as if more fully set forth herein.

155.    Miles' complaints, requests for help, plea to be housed in a women's setting, to be removed from the cage, to complain of the conduct of the Defendants, to present evidence of her rape to the court/hearing officer, are all protected speech.

156.    Miles pleaded,  petitioned, and complained to the Defendants,  Does 1-15, and PREA AGENT 934,  PREA AGENT 188, and  PREA AGENT 916,  to be housed in a women's setting, to be placed in protective custody, to be protected, and to be removed from the cage.

157.    Miles filled out PREA forms provided by the Defendants,  Does 1-15, and PREA AGENT 934,  PREA AGENT 188, and  PREA AGENT 916.

158.    Miles was not issued PREA forms to petition the  Defendants,  Does 1-15, and PREA AGENT 934,  PREA AGENT 188, and  PREA AGENT 916, for safe treatment, and change in housing.

159.    Miles filed complaints to PREA AGENT 934,  PREA AGENT 188, and  PREA AGENT 916.

160.    Miles filed and made complaints about failure of PREA AGENT 934,  PREA AGENT 188, and  PREA AGENT 916, to take any action to help her.

161.    Miles filed and made complaints about failure Does 1-15  who failed to take any action to help her.

162.    As a result PREA AGENT 934,  PREA AGENT 188, and  PREA AGENT 916, took adverse action against Miles by refusing to process PREA paper work.

163.    As a result Defendants, Doe 1-15, PREA AGENT 934,  PREA AGENT 188, and PREA AGENT 916, took adverse action against Miles by refusing to process the bloody and semen filled sheets to any lab for processing.

164.    As a result, Defendants, Doe 1-15, PREA AGENT 934,  PREA AGENT 188, took adverse action against Miles by refusing to process PREA paper work.

165.    As a result, Defendants and  Doe 1-15, and PREA AGENT 934,  PREA AGENT 188, and  PREA AGENT 916 took adverse action against Miles by not reporting the sexual assault to the medical staff.

166.    As a result, Defendants and  Doe 1-15, and PREA AGENT 934,  PREA AGENT 188, and  PREA AGENT 916, took adverse action against Miles by not reporting the sexual

assault to any judge or hearing officer, at any proceeding.

167.    As a result, Defendants, Doe 1-15, PREA AGENT 934,  PREA AGENT 188, took adverse action against Miles by failing to protect Miles from Offender 2, by improperly escorting Miles.

168.    As a result, Defendants and Doe 1-15 took adverse action against Miles by permitting Offender 2 to physically assault and blind Miles.

169.    As a result, Defendants and Doe 1-15, and PREA AGENT 934,  PREA AGENT 188, and  PREA AGENT 916, took adverse action against Miles by refusing to transfer Miles to gender conforming housing.

170.    As a result, Defendants and Doe 1-15 took adverse action against Miles by refusing to place Miles in protective custody.

171.    As a result, Defendants and Doe 1-15 took adverse action against Miles by placing Miles in the cage, and let her be abused for three days.

172.    Doe 11-15 were grossly negligent in supervising subordinate Does 1-10 and PREA AGENTS 934, 188, 916, who committed the wrongful acts done to Miles, and were also deliberately indifferent  to the rights of Miles, when they failed to act on information indicating that Miles' First Amendment Rights were being violated, when they failed to take reasonable measures to abate the retaliatory harm when they knew or should have known that:

172.a  Miles' was not being presented with PREA paper work;

172.b  Miles had failed to be placed in protective custody;

172.c. Miles was being misgendered by Does 1-10 and was not being transferred to gender conforming housing;

172 .d Does 1-10  failed to respond adequately to Miles' repeated requests for protection

against harassment, threats, and sexual victimization at the hands of Does 1-10 and other inmates;

172.e. Does 1-10 did not house Miles outside the vicinity of Offender 2;

172.f. Does 1-10 failed to prevent Offender 2 from being in the vicinity of Miles;

172.g. Does 1-10 failed to intervene when Offender 2 fought his way into Miles' cell, beat and blinded Miles;

172.h. Does 1-10 approved Miles being housed in the open cage;

172.i. Does 1-10 permitted Miles to be repeatedly peed on, spit on, and called a trans faggot by many of the inmates in the cage adjacent to hers, for three days.

172.j. Does 1-10 failed to note that Miles's had been sexually assaulted on paperwork presented to the NEW YORK CITY HALTH +HOSPITALS CORPORATION (CORRECTIONAL HEALTH SERVICES) and Does 16-18.

## AS AND FOR A THIRD CAUSE OF ACTION
### 42. U.S.C. § 1983 – Fourth Amendment U.S.C.
### Unreasonable Search and Seizure Does 6-10; Failure to Supervise Doe 11-15

173.     Plaintiff repeats and reiterates the factual allegations at paragraphs "1" through "172.j" as if more fully set forth herein.

174.     Miles attempted to refuse the strip-search examination that was going to being administered by male Doe 6-10.

175.     Miles requested that the strip-search be conducted by a woman.

176.     Defendants and Doe 6-10 refused Miles' request that her strip search be conducted by a female.

177.     Defendants and Doe 6-10 proceeded to administer the strip-search of Miles.

178.     Defendants administered a cross-gender strip-search of Miles.

179.    Miles genitals were exposed to Doe 6-10, and Doe 6-10 performed a visual body cavity search of Miles.

180.    Doe 6-10 performed a visual body cavity search of Miles in which a visual inspection of Miles genitals and anal areas.

181.    Miles was frightened and humiliated, all the while and during, the cross-gender strip-search.

182.    Miles was frightened and humiliated, all the while and during, the cross-gender visual body cavity search.

183.    Miles underwent the strip-search and visual body cavity search amongst male inmates, in a public area.

184.    Miles underwent the strip-search and visual body cavity search in a public area, despite, private areas being readily available in which the searches could have been conducted.

185.    All the while, and during the cross-gender strip-search and visual body cavity search, Miles was subjected to transphobic slurs, sneers, and jeers of Doe 6-10.

186.    Female correction officers were readily available to perform the strip-search and visual body cavity search, of Miles.

187.    Facilities for females were readily available, at which the strip-search and visual body cavity search, of Miles, could have been performed.

188.    The searches of Miles were gratuitous and were conducted for the sole purpose of observing Miles, a transgender or intersex inmates genital characteristics.

189.    Defendants' unlawful conduct alleged above violated MILES' rights under the Fourth Amendments of the U.S. Constitution.

190.    Doe 11-15 were grossly negligent in supervising subordinate Doe 1-10, who

committed the wrongful acts done to Miles, and were also deliberately indifferent to the rights

of Miles, when they failed to act on information indicating that Miles' Fourth Amendment

Rights were being violated, when they failed to take reasonable measures to abate the Fourth

Amendment Violations of Miles' rights, when they knew or should have known that:

190.a  Miles' identified as a transgendered woman and LGBTQIA+ individual;

190.b  Miles requested that she be strip-searched and/or visual body cavity searched by a

female;

190.c. Doe 1-10 refused Miles' request and male staff proceeded to strip-searched and/or

visual body cavity search Miles over Miles objection, despite female officers being

available to conduct the search;

190.d. Doe 1-10 searches of Miles were gratuitous and were conducted for the sole

purpose of observing Miles, a transgender or intersex inmates genital characteristics.

190.e. Doe 1-10 searches of Miles was performed in public when a more private setting

was available;

### AS AND FOR A FOURTH CAUSE OF ACTION
**42. U.S.C. § 1983 Eighth Amendment USC**
**Deliberate Indifference to Medical Needs Does 16-18;**
**Failure to Supervise Doe 11-15**

191.    Plaintiff repeats and reiterates the factual allegations at paragraphs "1" through

"190.e" as if more fully set forth herein.

192.    Defendants and Does 16-18, have a duty to take reasonable measures to guarantee

Miles received appropriate medical care at all times that she was in custody.

193.    Miles reported to Defendants and Does 16-18 that her eyes were causing her

chronic and substantial pain, and were burning and stinging.

194.    Miles reported to Defendants and Does 16-18 that a chemical mixed in boiling hot

water were thrown in her eyes.

195.   Miles reported to Defendants and Does 16-18 that when she could open her eyes despite the extreme pain her eye sight was severely impaired in both eyes.

196.   Defendants and Does 16-18 provided no medical treatment to Miles' eyes that would stop the pain or reverse, or pause the damage done to her eyes that caused her to lose her eye sight.

197.   The medical condition of Miles' eyes were reported to Defendants and Doe 16-18 and were readily apparent to Doe 16-18, and were known to be in a condition that significantly affects Miles' daily activities.

198.   Miles was denied treatment to his eyes and no steps were taken to protect or preserve her vision,

199.   Defendants and Does 16-18 knew that if left untreated Miles' faced an excessive risk that her eyes would be permanently damaged, and that the substantial risk of this serious harm existed at all times that Miles was under their care.

200.   Defendants and Does 16-18 consciously disregarded the substantial risk of serious, and permanent harm to Miles' eyes, when they took no measure to treat Miles' eyes, resulting in permanent partial blindness in both eyes.

201.   Defendants and Does 16-18 committed malpractice when the recklessly failed to treat Miles' eyes.

202.   Defendants' unlawful conduct alleged above violated MILES' rights under the Eighth Amendment of the U.S. Constitution.

203.   Doe 11-15 were grossly negligent in supervising subordinate Doe 16-18 who committed the wrongful acts done to Miles, and were also deliberately indifferent  to the rights

of Miles, when they failed to act on information indicating that Miles' Eighth Amendment
Rights were being violated, when they failed to take reasonable measures to abate the violations
of Miles' rights,  when they knew or should have known that:

203.a  Miles' eyes were affected by chemicals;

203.b  Doe 11-15 failed to treat Miles' eyes;

203.c. Doe 11-15 failed to take any measure to minimize Miles' risk of permanent
blindness;

203.d. Doe 11-15 refused to administer an anti-viral to Miles after learning that he had
been raped on two occasions.

### AS AND FOR A FIFTH CAUSE OF ACTION
**City of New York & Rikers Respondeat Superior**

204.      Plaintiff repeats and reiterates the factual allegations at paragraphs "1" through
"203.d" as if more fully set forth herein.

205.      The City of New York and Rikers, custom, policy, usage, provides that on intake
the Defendants shall have three days to determine and assign the gender housing of Miles.
4498R-A. IV(o).

206.      In the interim period, despite Miles' request, and markings by court personnel,
and Judges on Mile's securing orders, issued the day of being taken into custody, that Miles
identified as transgender, it was the policy of the City of New York and Rikers to house Miles in
a non-gender conforming setting.

207.      City of New York and Rikers policy, and practice, is to house  transgender
females, such as Miles, in male populated housing settings, despite the obvious and known
heightened physical danger it poses to Miles, for up to three days, until a determination is made
as to the appropriate housing accommodation for Miles.

208.     As the result of the deliberate conduct, policy, and practice of New York City and Rikers, Miles was taken into custody and was immediately placed in a male housing.

209.     The New York City and Rikers policy was the moving force behind Miles sexual assault in prison, and the violation of Miles rights under Eighth Amendment.

210.      The City of New York and Rikers, custom, policy, usage, provides that on intake and processing transgender women, such as Miles, are strip searches and visual cavity searches are performed by men.

211.     The City of New York and Rikers, custom, policy, usage, does not provide transgender women, such as Miles, the option to be strip searched and visual cavity searched by a person of their gender-preference, during intake and processing.

212.     As the result of the deliberate conduct, policy, and practice of New York City and Rikers, Miles strip-searched and visual cavity searched by males and ignored her plea and request that the searches be conducted by females.

213.     The New York City and Rikers policy was the moving force behind the violation of Miles' Fourth Amendment rights under the U.S. Constitution.

214.     Miles suffered, fear, fright, shock, and humiliation, as a result thereof.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff demands judgment, as follows:

I.     As and for the First and Second Causes of Action a money judgment in an amount to be determined at trial but not expected to be less than Five-Million ($5,000,000) dollars;

II.     As and for the Third Causes of Action a money judgment in an amount to be determined at trial but not expected to be less than One-Million ($1,000,000) dollars;

III.     As and for the Fourth Causes of Action a money judgment in an amount to be determined

at trial but not expected to be less than Five-Million ($5,000,000) dollars;

IV.     As and for the Fifth Cause of Action a money judgment in an amount to be determined at

trial but not expected to be less than Five-Million ($11,000,000) dollars;

V.      Judgment in favor of Plaintiff against all Defendants for compensatory and punitive

damages in an amount to be determined by a properly charged jury;

VI.     A monetary award for attorneys' fees and the costs of this action, pursuant to 42 U.S.C. §

1988, 42 U.S.C. § 12205 and any other applicable law.

        Dated: New York, New York
             August 24, 2023

                         Law Offices of Peter Sverd, PLLC

                    By:_____
                         Peter Sverd, Esq. (PS0406)
                    225 Broadway, Ste 613
                    New York, NY 10007
                    (646) 751-8743